**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAMES HIGGINS, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br>       v.<br><br>UBIQUITI INC.,<br>                              Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMAND** |

Plaintiff James Higgins ("Plaintiff"), individually and on behalf of others similarly situated, by and through his undersigned counsel, and for his Class Action Complaint against Ubiquiti Inc. ("Ubiquiti" or "Defendant"), alleges as follows based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by counsel and review of public documents as to other matters.

**NATURE OF THE ACTION**

1.      This is an action for damages and/or other available legal or equitable remedies for Unjust Enrichment, Money Had and Received, violations of the New York General Business Law ("GBL"), N.Y. Gen. Bus. Law §§ 349 *et seq*., and the Michigan Consumer Protection Act ("CPA"), Mich. Comp. Laws §§ 445.903 *et seq*. related to tariff surcharges imposed and collected by Defendant from Plaintiff and other similarly situated purchasers for tariffs that have been declared unlawful and for tariff surcharges that exceed the amount of lawfully owed tariffs.

**PARTIES**

2.      Defendant Ubiquiti Inc. ("Defendant" or Ubiquiti) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 685 Third

1

Avenue, 27th Floor, New York, NY 10017.[1] Ubiquiti designs, manufactures, and sells wireless data communication and wired products for enterprises and homes. One of its best-known product lines is UniFi which is focused on home, prosumer, and business networking equipment, cameras, physical access control systems, and VoIP phones. Ubiquiti product lines also include AmpliFi, EdgeMax, UISP, airMAX, airFiber, GigaBeam, and UFiber. Ubiquiti also offers a variety of software products. Ubiquiti sells its products throughout the United States through its online retail storefront at *ui.com* and a network of dealers. Ubiquiti manufactures its hardware primarily through third-party contract manufacturers primarily in Vietnam and China. Ubiquiti reported nearly $2.574 billion in revenue for 2025, and its trailing twelve months revenue is $3.10 billion, representing a 33.34% year-over-year increase.

3.      Plaintiff James Higgins is a citizen and resident of the State of Michigan, residing in Wolverine Lake, Michigan. During the relevant period, Plaintiff purchased Ubiquiti products through Defendant's online storefront at *ui.com* and was charged over $100 in tariff surcharges for tariffs that have been deemed unlawful by the Supreme Court and/or which exceed the lawful amount of tariffs imposed on the products he purchased.

### JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds $5,000,000, this is a class action in which there are more than 100 members of the proposed Classes, members of the Classes are citizens of states different from Defendant, and greater than two-thirds of the members of the proposed Classes reside in states other than Delaware.

---

[1] DE File No. 4834536.

5.     This Court may properly exercise personal jurisdiction over Defendant because Defendant is incorporated in Delaware and therefore resides in this District.

6.     Venue is proper in this District because Defendant is incorporated in Delaware and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2).

## FACTUAL ALLEGATIONS

### IEEPA Tariffs

7.     Beginning in February 2025, President Donald J. Trump issued a series of Executive Orders imposing nearly worldwide tariffs on goods imported into the United States purportedly authorized under the IEEPA. These Executive Orders imposed an array of duties ranging from 10% to 145% based on country-specific tariff rates. *See* Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025); Exec. Order No. 14259, 90 Fed. Reg. 15509 (Apr. 8, 2025); Exec. Order No. 14266, 90 Fed. Reg. 15625 (Apr. 9, 2025).

8.     With respect to goods imported from Vietnam, Executive Order 14257 imposed 46% "reciprocal" tariffs effective April 9, 2025, but that rate was suspended and reduced to 10% effective April 10, 2025. Thereafter, effective August 7, 2026, the IEEPA tariff rate became 20% pursuant to Executive Order 14326.

9.     With respect to goods imported from China:

   a.     Executive Order 14195 imposed 10% fentanyl-related tariffs effective February 4, 2025, which were increased to 20% effective March 3, 2025, and then reduced back to 10% on November 4, 2025; and

   b.     Executive Order 14257 imposed a "reciprocal" tariff under the IEEPA of 34% on goods from China effective April 5, 2025, which was increased to

125% effective April 10, 2025, and then reduced to 10% effective May 14, 2025.[2]

10.    Tariff rates are applied to the "dutiable value" of imported goods, which reflects the importer's cost of the goods—not their retail price.

11.    IEEPA tariffs were imposed on goods at the time they were entered for consumption or withdrawn from warehouse for consumption in the U.S.

Ubiquiti Tariff Surcharges

12.    In connection with the imposition of these IEEPA tariffs, beginning in or around October 2025, Ubiquiti began adding a "Tariff Surcharge Fee"—typically 7.2% of retail price—to orders of certain products sold directly through its website.[3] The Tariff Surcharge was in addition to all other charges, such as shipping and state sales tax.

13.    The Tariff Surcharge appeared as a separate line item during the online checkout process. At that point of sale, Ubiquiti provided the following explanation:

> Why You See a Tariff Surcharge
>
> As you may know, tariffs have increased the cost of our products. We have elected to bear a portion of the increased cost to relieve the burden on our customers. The remainder of such increased cost will be added to the cost of the affected products. We hope the foregoing alleviates the impact of the tariffs and demonstrates our continued commitment to providing our customers with industry leading products at disruptive prices. Thank you for your understanding and continued trust.

---

[2] *See, e.g.*, Presidential 2025 Tariff Actions: Timeline and Status, available at: https://www.congress.gov/crs-product/R48549#_Ref196320321.

[3] *See* Ubiquiti Community Forum, *For US customers - tariffs are kicking in* (October 4, 2025), https://community.ui.com/questions/For-US-customers-tariffs-are-kicking-in/dd1992ef-c905-4c0f-95a7-eb070caa2ccc ("Just be aware, tariffs are starting to kick in. Right now it seems mostly on camera related products. It is 7.2% USD on those selected items…").

14.    Through this statement and related conduct, Ubiquiti represented that the Tariff Surcharge (a) directly reflected tariff-related cost increases, and (b) was limited to the portion of those costs not absorbed by Ubiquiti. These representations were material to reasonable purchasers because they go to price, described the reason for the surcharge, and conveyed that it was limited to only a portion of Ubiquiti's actual tariff-related costs.

15.    Ubiquiti also caused its authorized distributors to impose the same surcharge on affected products, although distributors typically embedded the charge in the listed product price rather than separately identifying it. Upon information and belief, Ubiquiti directed distributors to collect these amounts and remit them to Ubiquiti, resulting in an embedded Tariff Surcharge imposed on purchasers through indirect sales channels.

IEEPA Tariffs Invalidated

16.    On February 20, 2026, the United States Supreme Court held that IEEPA and the other statutes invoked in the Tariff Executive Orders do not authorize the President to impose tariffs. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026). Following that ruling, President Trump issued an Executive Order terminating the IEEPA tariffs, and U.S. Customs and Border Protection ("CBP") halted collection of IEEPA-based duties effective 12:00 a.m. ET on February 24, 2026.

17.    On March 4, 2026, the United States Court of International Trade ordered CBP to liquidate all unliquidated entries subject to IEEPA tariffs without regard to those duties and to reliquidate any liquidated entries for which liquidation is not final, effectively entitling importers of record to refunds of IEEPA duties paid. *Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 WL 616128, 2026 Lexis 112097 (Ct. Int'l Trade Mar. 4, 2026). As of that date, CBP had collected approximately $166 billion in IEEPA tariffs. *Atmus*, ECF No. 31 at ¶ 12.

18.     Further, the U.S. has announced that it will pay refunds of the unlawfully imposed IEEPA tariffs to the importer of record. Thus, Ubiquiti, as the importer of record for goods subject to IEEPA tariffs, is entitled to refunds of all IEEPA duties paid through CBP's administrative refund process.[4]

19.     Despite having passed IEEPA tariff costs on to purchasers through the Tariff Surcharge, Ubiquiti has not refunded, and has not committed to refund, any portion of those amounts to purchasers. As a result, Ubiquiti is positioned to recover twice for the same tariff burden—first from purchasers through the surcharge and again from the federal government through refunds.

20.     Additionally, upon information and belief, Ubiquiti continues to collect a "Tariff Surcharge Fee" on goods imported during the IEEPA period, even though it is entitled to a refund of the associated IEEPA tariffs on them.

21.     By contrast, other companies have implemented programs to refund or credit customers for tariff-related charges following the invalidation of the IEEPA tariffs.[5] Defendant has chosen not to do so.

---

[4] *See* U.S. Customs and Border Protection, *International Emergency Economic Powers Act (IEEPA) Duty Refunds*, https://www.cbp.gov/trade/programs-administration/trade-remedies/ieepa-duty-refunds (last visited June 1, 2026).

[5] *See* UPS, *IEEPA Tariff Refund Process*, https://www.ups.com/us/en/shipping/international-shipping/tariffs/tariff-refunds (last visited May 27, 2026); FedEx, *Navigating U.S. tariffs and customs regulations*, https://www.fedex.com/en-us/shipping/international/us-tariffs-impact.html (last visited May 27, 2026); DHL, *Navigating Latest Tariff Developments*, https://www.dhl.com/global-en/microsites-2-0/core/us-tariffs.html (last visited May 27, 2026); *see also* Jeannette Neumann, *Cards Against Humanity to Give Tariff Refunds to Buyers Who "Overpaid,"* Crain's Chicago Business (Feb. 25, 2026), https://www.chicagobusiness.com/consumer-products/cards-against-humanity-give-tariff-refunds/.

<u>Post-IEEPA Tariff Regime and Defendants' Continued and Now Misleading Surcharge</u>

22.    Effective February 24, 2026, the same day IEEPA tariffs were terminated, President Trump imposed a new 10% global import surcharge pursuant to Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132 ("Section 122").

23.    Ubiquiti has continued to impose a Tariff Surcharge of approximately 7.2% on many products and continues to provide the same explanation (*supra*, ¶ 13) to purchasers at checkout:



<sup>6</sup>

24.    For goods imported from Vietnam, however, Ubiquiti's 7.2% Tariff Surcharge exceeds any lawful tariff burden. Prior to February 24, 2026, no IEEPA tariff was lawfully due following the Supreme Court's decision. For goods imported thereafter, the Section 122 tariff is 10% of dutiable value—a measure that is substantially lower than 7.2% of retail price. Because retail prices materially exceed dutiable value, Ubiquiti's surcharge results in charges to purchasers that exceed the actual tariffs owed.

---

[6] Screenshot taken from https://store.ui.com/us/en/checkout (dated June 1, 2026).

25.    By way of illustration, if a product has a dutiable value of $40, the Section 122 tariff would be $4. If that product is sold at retail for $100, a 7.2% Tariff Surcharge yields $7.20—approximately 180% of the actual tariff amount. Upon information and belief, this scenario reflects Ubiquiti's current pricing practices, in which the Tariff Surcharge significantly exceeds actual tariff burdens because the retail price is significantly higher than the dutiable value.[7]

26.    At the same time, Ubiquiti misleading tells its customers that Ubiquiti is "bear[ing] a portion of the increased [tariff] cost to relieve the burden on our customers" and only passing the "remainder" to them. In reality, Ubiquiti is concealing a price increase behind the guise of a Tariff Surcharge. Ubiquiti tells customers it is protecting them from tariffs by absorbing part of the cost, when in reality it charges Tariff Surcharges that exceed the actual tariff burden.

27.    Contrary to its representations, Ubiquiti did not absorb a meaningful portion of the tariff costs; instead, it charged purchasers amounts equal to or greater than the actual tariff impact.

**PLAINTIFF'S PURCHASES**

28.    Between February 15, 2026 and April 1, 2026, Plaintiff made three separate purchases for his personal, residential use of Ubiquiti products through its website, *ui.com*, for which Plaintiff was charged Tariff Surcharges as a separate line item.

a.    On February 15, 2026, while the IEEPA tariffs were still in effect prior to the Supreme Court's decision in *Learning Resources*, Plaintiff purchased a "Reader G6 Entry" device[8] manufactured in Vietnam for which he paid $249.00 and was charged a Tariff Surcharge of $17.93, in addition to

---

[7] Ubiquiti reported GAAP gross margin of 47% in its recent filings with the Securities and Exchange Commission, which implies that, on average, for a product that retails for $100 Ubiquiti's Cost of Goods Sold (COGS) is about $53. ***Dutiable cost is significantly less than COGS***, however. The example above assumes dutiable cost is 40% of the retail price, which is a reasonable, realistic estimate.

[8] HTSUS 8525.89.

shipping and state sales tax. The IEEPA tariffs were declared unlawful just days later and Ubiquiti, as the importer of record, is entitled to obtain a full refund of them.

b.      On March 25, 2026, Plaintiff purchased two "Reader G6 Pro Entry" devices[9] manufactured in Vietnam for which he paid $379.00 each and was charged a total Tariff Surcharge of $54.58, plus shipping and tax. The Tariff Surcharge exceeded any actual tariff burden on the product at the time, which was zero if imported prior to February 24, 2026, and only 10% of the dutiable cost under Section 122 if imported after.

c.      On April 1, 2026, Plaintiff purchased another "Reader G6 Pro Entry" device[10] manufactured in Vietnam for which he paid $379.00 and was charged a Tariff Surcharge of $27.29, plus shipping and tax. The Tariff Surcharge exceeded any actual tariff burden on the product at the time, which was zero if imported prior to February 24, 2026, and only 10% of the dutiable cost under Section 122 if imported after.

29.     In making these purchases, Plaintiff viewed and relied on Ubiquiti's representations regarding the Tariff Surcharge, including its statements that the surcharge reflected tariff-related cost increases of which Ubiquiti was bearing a portion. Plaintiff would not have agreed to pay the Tariff Surcharge if Ubiquiti had disclosed the truth. As a result, Plaintiff paid more than he otherwise would have paid for the products.

30.     The product-level import origin, importer-of-record information, tariff classification, entry data, duty-payment records, and all records reflecting the tariff surcharge

---

[9] HTSUS 8525.89.
[10] HTSUS 8525.89.

9

amounts charged to Plaintiff and their relationship (if any) to actual tariff obligations are within

Defendant's possession, custody, or control.

## CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action individually and on behalf of the Class and the following

subclasses pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

**Class**: All persons in the United States who purchased Ubiquiti products and paid
a Tariff Surcharge.

**Subclass 1** ("IEEPA Period Subclass"):
All Class members who made purchases between October 1, 2025 and February
24, 2026.

> **Alternative Michigan SubClass 1A:** All Class members who made
> purchases in Michigan between October 1, 2025 and February 24, 2026.

**Subclass 2** ("Post-IEEPA Subclass"):
All Class members who made purchases on or after February 24, 2026.[11]

> **Alternative Michigan SubClass 2A:** All Class members who made
> purchases in Michigan on or after February 24, 2026.

32.    Plaintiff is a member of the Class and all Subclasses. The Class and Subclasses are

referred to collectively as the "Classes."

33.    Excluded from the Classes are: (1) Defendant; (2) Defendant's officers, directors,

and their immediate families; (3) any Judge or Magistrate Judge presiding over this action and

their staff and family; (4) persons who properly and timely request exclusion; (5) persons whose

claims have been finally adjudicated or released; and (6) counsel for both parties and their experts.

34.    **Numerosity.** The Classes are so numerous that joinder of all members is

impracticable. Ubiquiti sells networking products to millions of customers across the United States

through *ui.com*. Upon information and belief, there are at least hundreds of thousands of members

---

[11] Plaintiff reserves the right to modify the Class definitions prior to class certification.

in Subclass 1, and a substantial number of members in Subclass 2, all of whom can be identified through Defendant's own invoicing and transaction records.

35.    **Typicality.** Plaintiff's claims are typical of the claims of each Class. Plaintiff purchased products through *ui.com* during both the IEEPA tariff period and after the transition to the post-IEEPA tariff regime, and was charged explicit tariff surcharges on each occasion. The legal and factual bases of Defendant's liability are the same with respect to Plaintiff and all Class Members.

36.    **Commonality and Predominance.** Common questions of law and fact predominate over any individual questions, including:

    a.    Whether Defendant imposed Tariff Surcharges on products sold to purchasers through *ui.com* and through its authorized distributors;

    b.    Whether Defendant represented that such Tariff Surcharges reflected tariff-related cost increases of which Defendant was bearing a portion;

    c.    Whether Defendant, in fact, passed through purported IEEPA tariff costs to purchasers through separately itemized or embedded surcharges;

    d.    Whether Defendant is entitled to obtain refunds of IEEPA tariffs from the federal government;

    e.    Whether Defendant's retention of Tariff Surcharges after the invalidation of IEEPA tariffs constitutes unjust enrichment and/or violates the Michigan Consumer Protection Act;

    f.    Whether Defendant continued to impose Tariff Surcharges after February 24, 2026, under the post-IEEPA tariff regime;

11

g.      Whether Defendant's Tariff Surcharges correspond to, or exceed, the actual tariff-related costs attributable to the products sold;

h.      Whether Defendant's labeling and description of the Tariff Surcharge constitute material misrepresentations or omissions in violation of the Michigan Consumer Protection Act; and

i.      Whether Plaintiff and Class members are entitled to restitution, damages, injunctive relief, and attorneys' fees and costs.

37.     **Adequacy.** Plaintiff will fairly and adequately represent the interests of the Classes. Plaintiff has no interests antagonistic to the Classes and has retained counsel experienced in complex class action litigation.

38.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual damages of most Class Members are modest relative to the burden of individual litigation. A class action will provide the benefits of single adjudication, economy of scale, and uniformity of decision.

## NEW YORK CHOICE OF LAW ALLEGATIONS

39.     New York law governs Plaintiff's claims, including those asserted under New York General Business Law §§ 349 and 350, because New York has the most significant relationship to the conduct alleged herein.

40.     Defendant maintains its principal place of business in New York, and the conduct giving rise to Plaintiff's claims—including the development, implementation, and dissemination of the Tariff Surcharge policy, pricing methodology, and related consumer-facing representations—originated from and was directed within New York.

41.    Defendant's Tariff Surcharge practices were established as part of a centralized, uniform policy that was conceived, controlled, and implemented by Defendant from its New York headquarters and applied consistently to purchasers nationwide.

42.    The representations at issue, including statements that Defendant was "bear[ing] a portion" of tariff costs and passing only the "remainder" to purchasers, were devised and approved by Defendant's management and personnel located in New York and disseminated through its website and distribution channels from that location.

43.    The injury at issue arises from Defendant's uniform course of conduct and standardized representations, which emanated from New York, rather than from any individualized interactions in purchasers' home states.

44.    Applying New York law to Plaintiff's claims promotes uniformity and predictability because Defendant's conduct was national in scope and centrally directed, and the material aspects of that conduct occurred in New York.

45.    New York has a strong interest in regulating the conduct of businesses headquartered within its borders and in ensuring that such businesses do not engage in materially misleading or deceptive practices that impact consumers.

46.    Accordingly, New York has the most significant relationship to the claims at issue, and its substantive law governs Plaintiff's claims.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the New York General Business Law**
**N.Y. Gen .Bus. Law §§ 349 and 350**
**(on behalf of Plaintiff and Subclasses 1 and 2)**

47.     Plaintiff repeats and incorporates the foregoing allegations as if fully set forth herein.

48.     Defendant's principal place of business is located in New York, and the challenged conduct alleged herein—including the development, implementation, and dissemination of its Tariff Surcharge pricing practices and related consumer representations—was directed from and occurred, in substantial part, within the State of New York.

49.     New York General Business Law ("GBL") § 349 prohibits unfair, deceptive, or abusive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York. An act or practice is unfair when it causes or is likely to cause substantial injury which is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. GBL § 349(a)(1). An act or practice is deceptive if it is likely to mislead a reasonable consumer acting reasonably under the circumstances. An act or practice is abusive when: (i) it materially interferes with the ability of a person to understand a term or condition of a product or service; or (ii) it takes unreasonable advantage of: (A) a lack of understanding on the part of a person of the material risks, costs, or conditions of a product or service; (B) the inability of a person to protect such person's interests in selecting or using a product or service; or (C) the reasonable reliance by a person on a person engaging in the act or practice to act in the relying person's interests. GBL § 349(a)(2).

50.     GBL § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in New York.

14

51.     **Subclass 1 (IEEPA Period):** In connection with the imposition of IEEPA tariffs, during the IEEPA period Defendant imposed a "Tariff Surcharge" on purchases and represented to purchasers through the explicit "Tariff Surcharge Fee" label on its invoices and through its accompanying disclosure—stating that it was "bear[ing] a portion of the increased [tariff] cost to relieve the burden on our customers" and passing only the "remainder" to them—that the surcharge corresponded to a legitimate, proportionate pass-through of Defendant's actual tariff costs. Defendant also required its distributors to collect the Tariff Surcharge and remit it to Defendant. Defendant, however, is entitled to a full refund of the IEEPA tariffs and, upon information and belief, either has or will receive such refunds. Defendant has not refunded, and has not committed to refund, any portion of the Tariff Surcharges collected from Plaintiff and Subclass 1 members, even though those charges were imposed to offset the same tariff costs that Defendant is entitled to recover from the government.

52.     Defendant's retention of both (a) the Tariff Surcharges and (b) the refunded tariff amounts constitutes an "unfair" practice within the meaning of GBL § 349 because it causes substantial injury to Subclass 1 members that is not reasonably avoidable and not outweighed by countervailing benefits to consumers or to competition. It causes substantial injury because Plaintiff and the Class Members paid Tariff Surcharges in amounts exceeding Defendant's actual tariff costs, and paid sales tax assessed on those surcharge amounts, resulting in concrete economic harm. It was not reasonably avoidable because the Tariff Surcharge was presented to purchasers as a mandatory line item during the ui.com checkout process and purchasers had no ability to opt out of the surcharge, no access to Defendant's import cost data or duty-payment records, and no practical means of verifying whether the surcharge corresponded to Defendant's actual tariff obligations or identifying the discrepancy between the retail-price surcharge rate and the dutiable-

value tariff rate. And it was not outweighed by countervailing benefits because there is no cognizable consumer or competitive benefit from Defendant collecting surcharge amounts and then retaining government refund proceeds corresponding to costs collected from purchasers.

53.    **Subclass 2 (Post-IEEPA Period):** After the IEEPA tariffs were struck down and the Government announced that refunds would be paid, Defendant continued to charge the "Tariff Surcharge" and to state that the surcharge reflected a proportionate pass-through of its actual tariff costs while Defendant absorbed a portion, i.e., that the surcharge corresponded to a legitimate, proportionate pass-through of Defendant's actual tariff costs. In reality, after February 24, 2026, the Tariff Surcharge often exceeded the total amount of applicable tariffs.

54.    For products imported from Vietnam prior to February 24, 2026, the amount of authorized tariff is effectively zero following the invalidation of the IEEPA tariffs and the availability of refunds. As a result, Defendant's post-February 24 representations that it was passing through only a portion of actual tariff costs for such products were false or materially misleading, because the underlying tariff burden had been eliminated or was subject to full recovery.

55.    Similarly, for products imported from Vietnam after February 24, 2026, the applicable tariff is approximately 10% of dutiable value. Because Defendant calculated the Tariff Surcharge as a percentage of retail price, it frequently collected amounts that equaled or exceeded the total tariff paid on the product. Defendant's representation that purchasers bore only a portion of the tariff cost was therefore false or materially misleading.

56.    In sum, for Subclass 2, Defendant's continued use of the label "Tariff Surcharge Fee" misrepresented the legal basis and amount of any tariff obligation being passed through to purchasers. Defendant's ongoing representation that it was bearing "a portion" of its increased

tariff costs and passing only the "remainder" to purchasers remained materially false during the Subclass 2 period. The surcharge bore no reasonable relationship to Defendant's actual tariff obligations, and purchasers lacked access to the information necessary to identify or challenge this discrepancy.

57.     The deceptive character of Defendant's post-IEEPA Tariff Surcharge is further confirmed by the fact that Defendant's "Tariff Surcharge" was created specifically in response to IEEPA, and Defendant's failure to retire or recalibrate it following IEEPA's invalidation—while continuing to represent it as a proportionate tariff pass-through—is not attributable to any pre-existing, general tariff pass-through practice.

58.     Thus, for the post-IEEPA subclass (Subclass 2), Defendant's imposition of a Tariff Surcharge that equals or exceeds the actual tariff liability of a product is "unfair" in violation of GBL § 349 because it causes or is likely to cause substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits. Plaintiff and the Class Members paid Tariff Surcharges in amounts exceeding the amounts lawfully due, and paid sales tax assessed on those surcharge amounts, resulting in concrete economic harm. Subclass 1 Members additionally face the prospect of Defendant obtaining double recovery—collecting both consumer surcharge payments and full government tariff refunds for the same underlying costs—while consumers have no independent avenue to recover those amounts. The Tariff Surcharge was presented to consumers as a mandatory line item during the *ui.com* checkout process. Consumers had no ability to opt out of the surcharge, no access to Defendant's import cost data or duty-payment records, and no practical means of verifying whether the surcharge corresponded to Defendant's actual tariff obligations or identifying the discrepancy between the retail-price surcharge rate and the

dutiable-value tariff rate. The information necessary to identify or challenge the overcharge was exclusively within Defendant's possession.

59.    There is no cognizable consumer or competitive benefit from Defendant collecting surcharge amounts in excess of its actual tariff costs, retaining government refund proceeds corresponding to costs already collected from consumers (Subclass 1), or continuing to apply an IEEPA-era surcharge methodology after the IEEPA tariffs had been invalidated and replaced by a materially different regime (Subclass 2).

60.    Defendant's conduct is also deceptive because it is likely to mislead a reasonable consumer acting reasonably under the circumstances about the nature of the charges.

61.    It is also abusive in violation of GBL § 349 (a)(2) because Defendant's statements (i) materially interfere with purchasers' ability to understand the terms and conditions of the transaction; and (ii) take unreasonable advantage of consumers' lack of understanding of tariff costs (GBL § 349(a)(2)(ii)(A)), Defendant's superior knowledge of its pricing and tariff obligations (GBL § 349(a)(2)(ii)(B)), and consumers' reasonable reliance on Defendant's representations that it was bearing a proportionate share of the tariff burden (GBL § 349(a)(2)(ii)(C)). The Tariff Surcharge was presented as a non-negotiable, mandatory charge at checkout with no disclosed methodology, no opt-out mechanism, and no means by which consumers could independently verify its accuracy or challenge its basis. Consumers were structurally unable to protect themselves against an overcharge that could only be identified by accessing Defendant's proprietary import and pricing data; and Defendant took unreasonable advantage of consumers' reasonable reliance on Defendant to act in their interests, within the meaning of GBL § 349(a)(2)(ii)(C). Defendant's explicit disclosure—representing that it had "elected to bear a portion of the increased cost to relieve the burden on our customers"—invited

consumers to trust that the surcharge reflected a good-faith, proportionate allocation of tariff costs between Defendant and its customers. Consumers reasonably relied on this representation. Defendant was collecting more than its actual tariff costs from consumers while simultaneously pursuing, or positioning itself to pursue, full government reimbursement of those same costs.

62. Defendant's conduct also violates GBL § 350 because it constituted false advertising. Defendant represented that the Tariff Surcharge reflected a cost-based pass-through of tariff obligations, when in reality the surcharge exceeded those obligations and functioned, in whole or in part, as a concealed price increase. These representations were materially false and misleading to reasonable purchasers.

63. Defendant's conduct was consumer-oriented in that it involved standardized pricing practices and uniform representations made to consumers nationwide through Defendant's website and distribution channels.

64. Plaintiff and Class members suffered injury as a result of Defendant's deceptive acts and practices by paying Tariff Surcharges they otherwise would not have paid, or would have paid in lesser amounts, had the true nature of those charges been disclosed.

65. Plaintiff has suffered actual damages as a result of Defendant's violations of GBL §§ 349 and 350.

66. Because the challenged acts and practices were devised, controlled, and implemented in New York, and the representations at issue were generated and disseminated from that location, they constitute deceptive practices occurring "in this state" within the meaning of New York General Business Law §§ 349 and 350.

67.     Pursuant to GBL § 349(h), Plaintiff and the Class Members are entitled to recover the greater of their actual damages or $50 per violation, treble damages up to $1,000 per violation for willful or knowing violations, reasonable attorneys' fees, and injunctive relief.

**COUNT II (in the alternative)**
**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws § 445.903 et seq.**
**(on behalf of Plaintiff and Subclasses 1A and 2A)**

68.     Plaintiff incorporates the foregoing allegations as if fully stated herein.

69.     Plaintiff asserts this claim in the alternative to Count I under the NY GLB.

70.     Plaintiff and the members of Subclasses 1A and 2A are "person[s]" within the meaning of Mich. Comp. Laws § 445.902(1)(d). Defendant is a "person" engaged in "trade or commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

71.     The Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

72.     With respect to **Subclass 1A (IEEPA Period)**: Defendant represented to purchasers through the explicit "Tariff Surcharge" label on its invoices and through its accompanying disclosure—stating that it was "bear[ing] a portion of the increased [tariff] cost to relieve the burden on our customers" and passing only the "remainder" to them—that the surcharge corresponded to a legitimate, proportionate pass-through of Defendant's actual tariff costs. Defendant also required its distributors to collect the Tariff Surcharge and remit it to Defendant. Defendant is entitled to claim a full refund of the IEEPA tariffs and, upon information and belief,

20

either has or will receive seek and obtain such refunds. As such, it is unfair and/or unconscionable for Defendant to retain the Tariff Surcharges collected from members of Subclass 1 under these circumstances.

73.    Defendant has not refunded, and has not committed to refund, any portion of the Tariff Surcharges collected from Plaintiff and Subclass 1A members, even though those charges were imposed to offset the same tariff costs that Defendant is entitled to recover from the government. Defendant's retention of both (a) the Tariff Surcharges and (b) the refunded tariff amounts constitutes an unfair and unconscionable practice within the meaning of the MCPA. This conduct is "unfair" because it results in Defendant retaining duplicative compensation—first from purchasers and then from the federal government—thereby causing substantial and unavoidable economic harm to Plaintiff and Subclass 1A members.

74.    With respect to **Subclass 2A (Post-IEEPA Period)**, Defendant represented to purchasers—through the "Tariff Surcharge" label and accompanying disclosure—that the surcharge reflected a proportionate pass-through of its actual tariff costs while Defendant absorbed a portion, i.e., that the surcharge corresponded to a legitimate, proportionate pass-through of Defendant's actual tariff costs. In reality, after February 24, 2026, the Tariff Surcharge often exceeded the total amount of applicable tariffs.

75.    For products imported from Vietnam prior to February 24, 2026, the amount of authorized tariff is effectively zero following the invalidation of the IEEPA tariffs and the availability of refunds. As a result, Defendant's post-February 24 representations that it was passing through only a portion of actual tariff costs for such products were false or materially misleading, because the underlying tariff burden had been eliminated or was subject to full recovery.

76. Similarly, for products imported from Vietnam after February 24, 2026, the applicable tariff is approximately 10% of dutiable value. Because Defendant calculated the Tariff Surcharge as a percentage of retail price, it frequently collected amounts that equaled or exceeded the total tariff paid on the product. Defendant's representation that purchasers bore only a portion of the tariff cost was therefore false or materially misleading.

77. In sum, for Subclass 2A, Defendant's continued use of the label "Tariff Surcharge Fee" misrepresented the legal basis and amount of any tariff obligation being passed through to purchasers. Defendant's ongoing representation that it was bearing "a portion" of its increased tariff costs and passing only the "remainder" to purchasers remained materially false during the Subclass 2A period. The surcharge bore no reasonable relationship to Defendant's actual tariff obligations, and purchasers lacked access to the information necessary to identify or challenge this discrepancy.

78. The deceptive character of Defendant's post-IEEPA Tariff Surcharge is further confirmed by the fact that Defendant's "Tariff Surcharge Fee" was created specifically in response to IEEPA, and Defendant's failure to retire or recalibrate it following IEEPA's invalidation—while continuing to represent it as a proportionate tariff pass-through—is not attributable to any pre-existing, general tariff pass-through practice.

79. Defendant knew or should have known that its conduct violated the Michigan CPA. Defendant controls its own invoice systems, pricing methodology, import records, and duty-payment data. The Supreme Court's February 20, 2026, ruling was a widely publicized, landmark decision directly affecting Defendant's obligations as an importer of record. Defendant's failure to reconcile its purchaser-facing Tariff Surcharge with its actual tariff costs and obligations—while

continuing to make affirmative representations about the nature of the surcharge—was either intentional or the product of reckless indifference to the accuracy of its pricing representations.

80.     Defendant's conduct offends public policy because it permits a company to collect from purchasers a charge labeled as a proportionate tariff pass-through while: (a) simultaneously pursuing full government reimbursement of the same tariff costs (**Subclass 1A**); and (b) charging purchasers a surcharge that demonstrably exceeds its actual tariff obligations under the applicable post-IEEPA tariff structure, while misrepresenting the basis and amount of those obligations (**Subclass 2A**).

81.     As a proximate result of Defendant's violations of the Michigan CPA, Plaintiff and the Class Members suffered actual economic damages including: (i) with respect to **Subclass 1**, the full amount of Tariff Surcharges paid during the IEEPA period, which Defendant is positioned to recover in full from the federal government; and (ii) with respect to **Subclass 2**, the amount by which the Tariff Surcharges collected exceeded Defendant's actual tariff costs under the applicable post-IEEPA tariff regime, together with all sales tax assessed on those surcharge amounts.

82.     Plaintiff and the Class Members are entitled to actual damages, reasonable attorneys' fees, and any other relief available under Mich. Comp. Laws § 445.911.

### COUNT III
### Unjust Enrichment
### (on behalf of Plaintiff and Both Classes)

83.     Plaintiff incorporates the foregoing allegations as if fully stated herein.

84.     With respect to **Subclass 1**, Plaintiff and Subclass 1 Members conferred a direct monetary benefit on Defendant by paying explicitly itemized Tariff Surcharges during the IEEPA period. Defendant accepted and retained these payments, which it represented as corresponding to its IEEPA tariff costs as importer of record. Defendant is now entitled to seek refunds of those

23

same costs from the federal government. Defendant is thus positioned to receive a windfall as a result of having passed those costs on to purchasers. Plaintiff and Subclass 1 Members conferred a well-defined monetary benefit on Defendant, and it would be unjust to permit Defendant to retain that benefit under these circumstances.

85.     With respect to **Subclass 2**: Plaintiff and Subclass 2 Members conferred a monetary benefit on Defendant by paying Tariff Surcharges that exceed the amount attributable to lawful tariff obligations. Defendant collected these amounts while making affirmative representations to purchasers that it was absorbing a portion of its tariff costs and passing only the remainder to purchasers—representations that were false or misleading.

86.     Defendant continued to collect Tariff Surcharges on goods that were imported prior to February 24, 2026, and for which Defendant is entitled to a full refund of any IEEPA tariffs paid. With respect to such goods, Defendant had no current tariff obligation to recover at the time of sale yet continued to collect a Tariff Surcharge from purchasers. Defendant has been unjustly enriched by the full amount of those surcharges.

87.     And for many products imported after February 24, 2026, Defendant has collected Tariff Surcharges that exceed the amount of the tariff actually paid on the product.

88.     Defendant knew and appreciated the benefits conferred by Plaintiff and the Classes because it set, collected, and retained the "Tariff Surcharge" amounts through its own pricing and invoicing systems, and made affirmative representations to purchasers about the basis and purpose of those charges.

89.     Defendant's retention of Tariff Surcharge amounts under the circumstances alleged herein is inequitable and unjust because those charges were represented as cost-based adjustments tied to tariff obligations that were either eliminated or refundable, or materially overstated.

90.     Plaintiff pleads this claim in the alternative to legal claims. To the extent legal remedies are found to be unavailable or inadequate, equity requires restitution because Defendant has retained benefits that, in good conscience, should be returned to Plaintiff and the Classes.

91.     Under principles of equity and good conscience, it would be unjust to permit Defendant to retain: (a) Tariff Surcharge amounts corresponding to IEEPA tariff costs for which Defendant will receive full government reimbursement; and (b) Tariff Surcharge amounts collected in excess of Defendant's actual tariff obligations under the applicable tariff regime.

92.     Plaintiff and the Classes are entitled to restitution of all amounts by which Defendant was unjustly enriched, including the Tariff Surcharge amounts improperly retained by Defendant, as well as disgorgement of any profits resulting from such conduct.

**COUNT IV**
**Money Had and Received**
**(on behalf of Plaintiff and Both Classes)**

93.     Plaintiff incorporates the foregoing allegations as if fully stated herein.

94.     This Count is pleaded in the alternative to Count II.

95.     With respect to **Subclass 1**: Defendant received money from Plaintiff and each Subclass 1 Member in the form of explicitly labeled Tariff Surcharges, collected for the stated purpose of recovering Defendant's IEEPA tariff costs as importer of record. The Supreme Court has since determined that those tariffs lacked statutory authorization. The money Defendant will recover from the government as IEEPA tariff refunds represents, in equity, a return of costs that were economically borne by Plaintiff and Subclass 1 Members through the Tariff Surcharges on their invoices. In equity and good conscience, Defendant should not be permitted to retain both the Tariff Surcharge proceeds collected from purchasers and the corresponding government refund

proceeds for the same underlying tariff costs. Defendant has not returned these amounts to Plaintiff or the Class and has established no mechanism to do so.

96.    With respect to **Subclass 2**: Defendant received money from Plaintiff and each Subclass 2 Member in the form of Tariff Surcharges collected after February 24, 2026, at a rate that exceeded Defendant's actual tariff obligations. The excess amounts were received by Defendant without legal or equitable justification corresponding to any actual tariff obligation, and in equity and good conscience must be returned. Additionally, to the extent any goods sold to Subclass 2 Members after February 24, 2026 were imported prior to that date and are therefore subject to a full IEEPA tariff refund, the entirety of the "Tariff Surcharge" collected on those goods was received without justification, as Defendant faces no net tariff cost on those units.

97.    Defendant has not returned any of these amounts to Plaintiff or the Classes. Under principles of equity, a claim for money had and received lies where a defendant has received money that, in good conscience, belongs to the plaintiff. Here, Defendant's retention of Tariff Surcharge amounts under the circumstances alleged is inequitable and unjust.

## COUNT V
### Declaratory Relief 28 U.S.C. § 2201 *et seq.*
### (on behalf of Plaintiff and Both Classes)

98.    Plaintiff incorporates the foregoing allegations as if fully stated herein.

99.    An actual controversy exists between Plaintiff and the Classes on the one hand, and Defendant on the other, concerning their respective rights and obligations with respect to the Tariff Surcharges collected by Defendant and the government tariff refunds Defendant has received or is entitled to receive.

100.    With respect to **Subclass 1**, a justiciable controversy exists as to: (a) whether Defendant is obligated to return to purchasers the Tariff Surcharge amounts corresponding to

IEEPA tariff costs for which Defendant has received or will receive government refunds; and (b) whether Defendant's retention of both the purchaser Tariff Surcharge proceeds and the government refund proceeds for the same underlying tariff costs is unlawful, unfair, unjust, and inequitable.

101.   With respect to **Subclass 2**, a justiciable controversy exists as to: (a) whether Defendant's post-February 24, 2026 Tariff Surcharges correspond to any legitimate tariff obligation of Defendant under the tariff regime then in effect; (b) whether Defendant's continued use of the "Tariff Surcharge" label and its accompanying representations constitutes a misrepresentation of the legal basis and amount of any tariff costs being passed through to purchasers; and (c) whether Defendant is obligated to return to purchasers the amounts by which those surcharges exceeded Defendant's actual tariff costs under the Section 122 regime.

102.   Declaratory relief is appropriate because it will resolve the parties' dispute regarding Defendant's rights and obligations with respect to the Tariff Surcharge and will clarify whether Defendant may continue to collect and retain such charges under the circumstances alleged. Absent such relief, Defendant's practices are likely to continue, resulting in ongoing harm to Plaintiff and the Classes.

103.   Pursuant to 28 U.S.C. § 2201, Plaintiff and the Classes seek a declaration that:

a.   With respect to **Subclass 1**, Defendant may not retain Tariff Surcharge amounts collected from purchasers to offset tariff costs to the extent Defendant has received or obtains refunds of those same costs from the government, and must return such amounts to affected purchasers; and further, to the extent Defendant has not yet sought refunds of IEEPA tariffs paid on goods for which it collected Tariff Surcharges from consumers,

27

Defendant is obligated to pursue all available refund mechanisms (including CBP liquidation, reliquidation, and any applicable administrative or judicial remedy) on behalf of and for the benefit of the consumers who bore the economic burden of those tariffs, and to distribute any refunds so obtained to those consumers;

b.      With respect to **<u>Subclass 2</u>**, Defendant may not represent Tariff Surcharges as reflecting tariff-related cost pass-throughs unless those charges reasonably correspond to its actual tariff obligations; and Defendant is obligated to return to purchasers any Tariff Surcharge amounts collected that exceed or are not reasonably related to its actual tariff-related costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that the Court:

a.      Certify the Classes as defined herein, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

b.      Award Plaintiff and the Classes actual damages, restitution, and/or disgorgement in amounts to be proven at trial, including: (i) Tariff Surcharge amounts paid by Subclass 1 Members; and (ii) for Subclass 2 Members, the portion of Tariff Surcharges that exceeded Defendant's actual tariff-related costs;

c.      Award Plaintiff and the Classes all sales tax amounts assessed on Tariff Surcharge amounts determined to be unlawful or excessive;

d.      Enter declaratory relief consistent with this Complaint, including declarations that:

(i)    Defendant may not retain Tariff Surcharge amounts corresponding to tariff costs for which it has received or obtains government refunds; and

(ii)    Defendant may not represent Tariff Surcharges as cost-based pass-throughs unless they reasonably correspond to actual tariff obligations;

e.    Enjoin Defendant from retaining, without appropriate refund or credit to the Classes, any government refund, credit, or other recovery corresponding to tariff costs previously passed through to Subclass 1 Members;

f.    Enjoin Defendant from imposing Tariff Surcharges that do not reasonably correspond to its actual tariff-related costs, and require Defendant to disclose in a clear and non-misleading manner the basis for any such charges;

g.    Order Defendant to provide an accounting of:

(i)    Tariff Surcharges collected from Plaintiff and Class Members;

(ii)    tariffs paid on products sold to Class Members;

(iii)    any government refunds, credits, or recoveries associated with those tariffs; and

(iv)    Defendant's tariff-related costs during the relevant periods;

h.    Award reasonable attorneys' fees, costs, and litigation expenses;

i.    Award pre- and post-judgment interest as permitted by law; and

j.    Grant such further relief as the Court deems just, proper, and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  June 3, 2026

Respectfully submitted,

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**

*By: /s/ Scott M. Tucker*
Robert J. Kriner (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
2711 Centerville Rd., Suite 201
Wilmington, DE 19808
Phone: 302-656-2500
Fax: 302-656-9053
rjk@chimicles.com
smt@chimicles.com

Timothy N. Mathews *(pro hac vice forthcoming)*
Dylan D. Altland *(pro hac vice forthcoming)*
361 West Lancaster Avenue
Haverford, PA 19041
Phone: 610-642-8500
Fax: 610-649-3633
*tnm@chimicles.com*
*dda@chimicles.com*

***Counsel for Plaintiff and the Proposed Class***